UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
MARATHON PROJECTS LTD.,

                               Plaintiff,                    10 CV 2396 (RPP)

       - against -
                                      **OPINION AND ORDER**

CREATIVE DESIGNS INTERNATIONAL,
      LTD.

                             Defendant.
---------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       Plaintiff Marathon Projects Ltd. ("Marathon") moves for summary judgment on

the Amended Complaint and dismissal of each counterclaim brought by Defendant

Creative Designs International, LTD. ("CDI").

## BACKGROUND

       Plaintiff Marathon is a corporation organized under the laws of the State of New

Jersey, whose principal place of business is in Midland Park, NJ.  (Pl.'s Local Rule 56.1

Statement of Undisputed Facts ("Pl.'s Rule 56.1 Statement") at ¶ 1.)[1]  Defendant CDI is a

corporation that was organized in 2005 under the laws of the State of Delaware,

originally under the name of "JPI/VII Acquisition Corp.," with a principal place of

business in Pennsylvania.  (Pl.'s Rule 56.1 Statement at ¶ 4.)  CDI is a wholly owned

subsidiary of JAKKS Pacific, Inc., a publicly held corporation.  (Id. at ¶ 5.)

       Marathon is in the business of seeking out and obtaining licensing opportunities,

both as an agent to licensors and as a manufacturer's licensing consultant to licensees, for

---

[1] All citations to either party's Local Rule 56.1 Statement of Undisputed Facts are undisputed by the
opposing party, unless otherwise stated.

the use of intellectual property.  (Id. at ¶ 2.)  On September 20, 1984, Marathon entered

into a consulting agreement with a Pennsylvania corporation, Creative Design

International, Ltd ("CDI-PA"), via a letter agreement.  (Decl. of Craig Kalter ("Kalter

Decl."), Ex. 1.)  Marathon consulted on behalf of CDI-PA pursuant to that agreement and

its subsequent amendments until November 15, 2005, when Marathon and CDI-PA

executed an Amended and Restated Consulting Agreement (the "ARCA").   (Decl. of

Craig Kalter at ¶ 5; Decl. of Larry Miller ("Miller Decl."), Ex. A.)   The ARCA, like

earlier consulting agreements between Marathon and CDI-PA, provides that Marathon

agrees to "evaluate, negotiate and secure, whenever possible, licensing and

merchandising rights for properties, characters, names, logos, that would be used on

Products produced by [CDI-PA] and its affiliates."  (Id. at ¶ 2.)  The ARCA further

provides that CDI-PA will pay commissions to Marathon "based solely on [CDI-PA]'s

Net Sales of Products under all relevant Property License Agreements."  (Id. at ¶ 3(a).)

The ARCA states that:

> In the event this Agreement is terminated pursuant to Paragraph 4 below,
> all Commissions relating to all Commissionable Property License
> Agreements shall continue to be earned by [Marathon] and shall be
> payable by [CDI-PA] and continue in full force and effect,
> notwithstanding such termination of this Agreement, for each
> Commissionable Property License Agreement, until the earlier occur of:
>
> (i)     The termination date of the respective Commissionable
>         Property License Agreement, or
> (ii)    With respect to:
>         a.  Continuing Property License Agreements, nine (9)
>             years after the termination date of this Agreement,
>         b.  Additional Property License Agreements, eight (8)
>             years after the December 31st in the first year in which
>             Products were shipped under each such Additional
>             Property License Agreement, and
>         c.  Post-Termination Property License Agreements, eight
>           (8) years after the December 31st in the first year in

> which Products were shipped under each such Post-
> Termination Property License Agreement

(Miller Decl., Ex. A at ¶ 3(f).)

The ARCA states that it remains in force until December 31, 2006, whereupon CDI-PA and Marathon could agree to extend the agreement, in writing.  (Id. at ¶ 4.)  The ARCA also provides that it "shall be interpreted under the laws of the State of New York, and shall inure to the benefit of the parties hereto, their assigns, successors, and legal representatives."  (Id. at ¶ 9.)[2]

On January 18, 2006, JPI/VII Acquisition Corp. purchased substantially all of the assets and liabilities of CDI-PA through an "Asset Purchase and Sale Agreement" (the "APA").  (Pl.'s 56.1 Statement at ¶ 10; Miller Decl., Ex. D.)    The APA provides that CDI-PA "shall and hereby agrees to assign…and JAKKS US [JPI/VII's parent company] shall and hereby agrees to assume and discharge…only the following liabilities and obligations…(A)  All obligations of the Company arising or first coming due after the Effective Time under the U.S. Included Contracts."  (Miller Decl., Ex. D § 2(c)(ii). (emphasis added))  In their memorandums of law, the parties agree that under the definitions provided in the APA, as well as under Schedule 4.13(a) to the APA, the ARCA is a "U.S. Included Contract" and accordingly was assigned to JAKKS US by CDI-PA.  (Pl.'s Mem. in Supp. at 5; Def.'s Mem. in Opp. at 5.)  The APA also states that "Following the closing date, Purchasers…agree to discharge in accordance with their

---

[2] Continuing Property License Agreement, Additional Property License Agreement and Post-Termination Property License Agreement are each defined in the ARCA, in Paragraphs 3(a), (b) and (c).  The tiered fee payments on CDI-PA net sales of products are set forth in Paragraphs 3(b) and (d).  CDI-PA's obligations to pay commissions are not terminated by the termination of the ARCA, but continue for eight or nine years after such termination.  (Miller Decl., Ex. A at ¶ 3(f).)

terms, the Assumed Obligations." (Miller Decl., Ex. D at § 11.8,) and that "The parties shall take all reasonably necessary steps and actions to provide Purchasers with the benefits of such Included Contracts, and to relieve Sellers of the performance and other obligations thereunder arising after the Effective Time." (Id. at § 11.10(b).) The Effective Time is defined as "11:59 p.m. on the Closing Date." (Id. at § 10.1) In conjunction with the APA, JPI/VII acquired the name Creative Designs International, Ltd., and CDI-PA, to the extent it remained a going concern, agreed not to use name "Creative Designs." (Miller Decl., Ex. D at § 11.16.) Geoffrey Greenberg served as President of both CDI-PA prior to the acquisition and as President of Defendant CDI from the date of the acquisition until December, 2008. (Pl's 56.1 Statement at ¶ 36.)

On December 31, 2006, Defendant CDI and Marathon executed an amendment to the ARCA, extending its terms through December 31, 2007. (Miller Decl., Ex. C.) This agreement was signed by Geoffrey Greenberg, President on behalf of CDI, and Craig Kalter, President on behalf of Marathon. (Id.) On December 25, 2007, CDI and Marathon executed a second amendment to the ARCA, extending its terms through December 31, 2008. (Id.) This amendment was also signed by Geoffrey Greenberg and Craig Kalter. (Id.) It is undisputed that Marathon continued to provide services to CDI through December 31, 2008. (Pl.'s 56.1 Statement at ¶ 33; Def.'s Reply to Pl.'s 56.1 Statement at ¶ 33.) From the date of the acquisition through the quarter ended March 31, 2009, CDI continued to pay commissions to Marathon from its sales of licensed products.[3] (Id. at ¶ 38.) Following Geoffrey Greenberg's resignation as President of CDI

---

[3] Defendant does not dispute that the payments were made, but contends that these payments were made pursuant to a mistake, not pursuant to its obligations under the ARCA. (Def.'s Reply to Pl.'s 56.1 Statement at ¶ 38.)

at the end of 2008, CDI has refused to pay commissions to Marathon for the period commencing April 1, 2009 to date, and contends that it does not owe any such commissions.  (Id. at ¶ 39; Def.'s Reply to Pl.'s 56.1 Statement at ¶ 39.)

On March 17, 2010, Marathon filed a complaint in this Court asserting claims for breach of contract and unjust enrichment.  On March 19, 2010, an Amended Complaint was filed, asserting the same causes of action.  On April 30, 2010, CDI filed an Answer to the Amended Complaint that also asserted a Counterclaim for return of funds mistakenly paid to Marathon following CDI's acquisition of CDI-PA.  The Counterclaim also seeks entry of a declaratory judgment that CDI is no longer obligated to pay commissions to Marathon.  Plaintiff moved for summary judgment and sanctions pursuant to 28 U.S.C. § 1927 on August 25, 2010.  Plaintiff's 28 U.S.C. § 1927 motion alleges that Defendant's counterclaim is vexatious and improper.  Plaintiff also moved for sanctions under Rule 11 on September 21, 2010, alleging that Defendant's claims of mistake are frivolous and that Defendant's counsel misrepresented the facts of the case.  CDI filed papers in opposition on October 1, 2010, and on October 4, 2010, cross-moved for partial summary judgment on its counterclaim for declaratory relief.   Marathon filed a reply brief in support of its motion and in opposition to the cross-motion on October 5, 2010, and CDI filed a reply in favor of its cross-motion on October 12, 2010.  Oral argument was held on February 24, 2011.

**DISCUSSION**

In support of its motion for summary judgment, Marathon contends that, in conjunction with its purchase of CDI-PA, CDI assumed CDI-PA's obligation to pay Marathon commissions on sales of licensed products pursuant to the ARCA.  Marathon

contends that the plain language of the ARCA and the APA unambiguously establish that CDI is bound by the terms of the ARCA.  In the alternative, Marathon urges that if the contractual language is ambiguous, applying the rule of practical construction determines the case in its favor.  CDI contends that the contractual language of the ARCA unambiguously binds CDI-PA to pay commissions to Marathon on its sales of licensed products, but does not obligate CDI to pay Marathon commissions on its CDI's sales of such products.  CDI argues that the assumption of the obligations of the ARCA reflected in the APA referred only to CDI's obligation to pay commissions on any sales made by CDI-PA following the acquisition, but that CDI was never obligated to pay commissions to Marathon on its own sales.  CDI also contends that its counterclaim for return of payments mistakenly made should not be dismissed because its allegation of mistake presents an issue of fact.  Marathon argues that the counterclaim is made subject to dismissal by reason of New York's voluntary payments doctrine.  Finally, Marathon contends that Defendant's pleading of mistake in light of the clear language of the contracts and certain emails circulated by Defendant's lawyers was a deliberate misrepresentation to the court and sanctionable under 28 U.S.C. § 1927 and Fed. R. Civ. P. 11.

For the reasons stated below, Marathon's motion for summary judgment on its breach of contract claim is granted, and Defendant's counterclaims are dismissed. Marathon's motions for sanctions are also granted.

I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). "In ruling on a motion for summary judgment, the district court is

required to resolve all ambiguities, and credit all factual inferences that could rationally

be drawn, in favor of the party opposing summary judgment." Kessler v. Westchester

County Dep't of Soc. Serv., 461 F.3d 199, 206 (2d Cir.2006) (quoting Cifra v. Gen. Elec.

Co., 252 F.3d 205, 216 (2d Cir.2001)). "A dispute about a genuine issue exists for

summary judgment purposes where the evidence is such that a reasonable jury could

decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d

Cir.2008). Unless the nonmoving party offers some hard evidence showing that its

version of the events is not wholly fanciful, summary judgment is granted to the moving

party. McCarthy v. Dun Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quotation

marks omitted).

      II.    Rights and Obligations Under the Relevant Agreements

      Under New York law, "[w]here the contract is unambiguous on its face, it should

be construed as a matter of law and summary judgment is appropriate." Niagara Frontier

Transit Metro Sys., Inc. v. County of Erie, 212 A.D.2d 1027, 623 N.Y.S.2d 33, 33

(App.Div.1995). [4] Contractual language is ambiguous "'if it is 'capable of more than one

meaning when viewed objectively by a reasonably intelligent person who has examined

the context of the entire integrated agreement and who is cognizant of the customs,

practices, usages and terminology as generally understood in the particular trade or

business.'" Well Luck Co., Inc. v. F.C. Gerlach & Co., Inc., 421 F.Supp.2d 533, 539

(E.D.N.Y. 2005) (quoting Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d

---

[4] New York law governs this diversity action pursuant to a choice of law provision in the ARCA. (Miller Decl., Ex. A at ¶ 9.)

260, 263 (2d Cir.1987)).  A contract is not necessarily ambiguous "simply because the parties urge different interpretations." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992). "[W]here the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." Feifer v. Prudential Ins. Co., 306 F.3d 1202, 1210 (2d Cir. 2002).

The contracts at issue in this case, the ARCA and the APA, are unambiguous, and viewed from the perspective of "a reasonably intelligent person…who is cognizant of the customs, practices, usages and terminology as generally understood in this particular trade or business," have only one meaning.  Well Luck Co., 421 F.Supp.2d at 539.  The unambiguous language of the agreements establishes that Defendant, by entering into the APA, was assigned CDI-PA's listed agreements and assumed CDI-PA's obligations under those contracts, including the ARCA, and thus is obligated to pay Marathon commissions on its sales of licensed products as set forth in the ARCA and its amendments.

Under New York law, "a business that merely purchases the assets of another business is not liable for the seller's debts and obligations."  Riverside Marketing, LLC v. Signaturecard, Inc., 425 F.Supp.2d 523, 535 (S.D.N.Y. 2006) (citing Schumacher v. Richards Shear Co., 59 N.Y.2d 239, 244-45, 464 N.Y.S.2d 437, 440 (1983); Cargo Partner AG v. Albatrans, Inc., 207 F.Supp.2d 86, 93 (S.D.N.Y. 2002)).  There are four exceptions to this rule that render a purchaser liable if:  "(1) the purchaser expressly or impliedly agrees to assume the obligations; (2) there was a consolidation or merger of the seller and purchaser; (3) the purchaser is a continuation of the seller; (4) the transaction

8

was entered into fraudulently to escape liability for such obligations." <u>Riverside</u>

<u>Marketing</u>, 426 F.Supp.2d at 535.

The parties agree that CDI expressly assumed the obligations of the ARCA in the

APA.  (Pl.'s Mem. in Supp. at 12, Def.'s Mem. in Opp. at 3.)  This assumption appears at

Section 2.1(c)(ii), which states:

> "Effective as of the Effective Time, the Company [CDI-PA] hereby agrees to assign, and the Stockholders shall and hereby agree to cause the Company [CDI-PA] to assign, and JAKKS US shall and hereby agrees to assume and discharge as of the effective time, only the following liabilities and obligations (collectively, the "US Assumed Obligations") in respect of the US Assets:
>
> (A) All obligations of the Company <u>arising or first coming due after the Effective Time</u> under the US Included Contracts;

(Miller Decl., Ex. D at§ 2.1(c)(ii). (emphasis added))

The US Included Contracts are defined as "Contracts included among the US

Assets."  (<u>Id.</u> at § 1.127.)  US Assets includes "any and all Contracts pertaining to the

Assets to the extent transferable."  (<u>Id.</u> at § 2.1(a).)  Section 4.13 of the APA explains that

"Except as set forth in Schedule 4.13(a), the Material Contracts are included among the

Included Contracts to be assigned to purchaser at closing."  (<u>Id.</u> at 31.)  Schedule 4.13(a)

lists the Material Contracts and at page 49 identifies the ARCA as an Included Contract.

(Lawless Decl., Ex. 14 at 49.)  Significantly, Schedule 4.13(a) also includes a list of

"Contracts Not to Be Included Among the Included Contracts."  (<u>Id.</u>)

Defendant concedes that CDI-PA assigned the obligations of the ARCA to CDI,

and that CDI assumed such obligations.  (Def. Mem. in Opp. at 5.)  Defendant contends,

however, that by assuming the obligations of the ARCA, CDI only assumed the

obligation to pay commissions on sales made by CDI-PA, not sales made by CDI. (Def.'s Mem. in Opp. at 5-6.)

When interpreting an unambiguous contract under New York law, "[w]ords and phrases are given their plain meaning." The Ananta Group, Ltd., v. Jones Apparel Group, Inc., No. 01 Civ. 674, 2001 WL 648926 at *6 (S.D.N.Y. June 11, 2001) (quoting Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 139 (2d Cir. 2001).  An assignment "transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." Citibank, N.A. v. Tele/Resources, Inc., 724 F.2d 266, 269 (2d Cir. 1983). "It has always been the law in New York that an assignee stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment." Septembertide Pub., B.V. v. Stein & Day, Inc.,  884 F.2d 675, 682 (2d Cir. 1989); see also Equity Properties Corp. v. Bonhomme, 124 Misc.2d 784, 785 (App. Div. 1st Dep't 1984) (recognizing the "common law rule" that "an assignee stands in the shoes of his assignor."). See also Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc., 36 N.Y.2d 121, 126, 325 N.E.2d 137, 139 (1975) ([a]n assignee "is subject to all the equities and burdens which attach to the property assigned").

CDI agrees in the APA to assume and discharge as agrees of the effective time all obligations of CDI-PA arising or first coming due after the Effective Time under the U.S. Included Contracts.  (Miller Decl., Ex. D at § 2.1(c)(ii).)  Thus, CDI-PA's assignment of the ARCA to CDI, and CDI's affirmative assumption of the "liabilities and obligations" of the ARCA, bound CDI to the obligations of the ARCA to the same extent that CDI-PA was bound.  Cf. Amalgamated Transit Union Local 1181, AFL-CIO v. City of New York, 45 A.D.3d 788, 790, 846 N.Y.S.2d 336, 338 (App. Div. 2d Dep't 2007) ("Although the

agreement purported to bind successors and assigns of the parties to the agreement, an assignee or successor will not be bound to the terms of a contract *absent an affirmative assumption of the duties under the contract*.")

Defendant's assertion that by assuming the obligations of the ARCA, it was obligating itself solely to pay commissions on sales made by CDI-PA is meritless and contradicts the plain meaning of the terms "assign" and "assume." <u>See</u> Am. Jur. 2 <u>Assignments</u> § 127; Restatement 2d of Contracts at § 328. It also seeks to render meaningless subparagraph (A) of Section 2.1(c)(ii) of the APA.  The APA is an 87-page document containing 132 defined terms, and by all appearances professionally drafted. The parties to this lawsuit are professional entities employed in the business of procuring or manufacturing pursuant to licensing agreements, familiar with contracts, and undoubtedly meet the qualification of "reasonably intelligent;" therefore the Court must apply the customary meaning to the documents' contractual terms.   <u>Well Luck Co., Inc.</u>, 421 F.Supp.2d at 539.  By affirmatively assuming the obligations of the ARCA, CDI stepped into the shoes of CDI-PA, and is liable for commission payments on its sales made pursuant to license agreements negotiated by Marathon to the same extent that CDI-PA was.  The language of the contracts unambiguously establishes CDI's continuing obligation to pay the commissions to Marathon during the time periods set forth in Paragraph 3 of the ARCA.

Plaintiff has demonstrated that there is no genuine issue of fact as to CDI's obligations under the ARCA following the execution of the APA, or as to CDI's breach

of those contractual obligations, and it is entitled to summary judgment as a matter of law. [5]

III.   Defendant's Counterclaims

In view of this Court's reading of the ARCA and the APA, as well as under clearly established law governing assignment and assumption, Defendant's counterclaims for repayment of funds mistakenly paid and unjust enrichment are meritless and accordingly dismissed.  The Counterclaim has all the earmarks of an effort by a large corporation, through the use of aggressive litigation tactics, to delay payment of a debt and drive up legal expenses of a smaller corporation in order to pressure that company to settle their claims for less than they are rightfully owed.

By paying commissions to Marathon on the sales made by CDI pursuant to the license agreements, Defendant was fulfilling its contractual obligations and Marathon was not unjustly enriched.  Defendant's obligations to pay further commissions to Marathon beyond the termination of the ARCA are expressly set forth in Paragraph 3 of that document.  (Miller Decl., Ex. A. at ¶ 3.)  Accordingly, Defendant's counterclaim for declaratory judgment is also dismissed.

IV.   Sanctions

Plaintiff moves for sanctions against Defendant's attorneys, Larry Miller and Jonathan Honig and their firm Feder Kaszovitz LLP under both 28 U.S.C. § 1927 and Federal Rule of Civil Procedure 11.  Plaintiff moved for sanctions under 28 U.S.C. § 1927 concurrently with its motion for summary judgment on the grounds that

---

[5] In addition to a claim for breach of contract, the Amended Complaint asserts an alternative cause of action for unjust enrichment.  Given the Court's ruling above in favor of Plaintiff's breach of contract claim, Plaintiff's claim for unjust enrichment is dismissed.

Defendant's Counterclaim seeking $1.478 million mistakenly paid to Marathon was known to be baseless to Defendant's attorneys at the time it was filed.  (Pl.'s Mem. in Supp. at 19.)  Plaintiff also filed a Motion for Sanctions under Rule 11 on September 21, 2010.

    A.  <u>Sanctions Under 28 U.S.C. § 1927</u>

    Section 1927 provides:

> "[a]ny attorney or other person admitted to conduct cases in any court of the United States…who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

28 U.S.C. §1927.

    In this Circuit, the imposition of sanctions under 28 U.S.C. § 1927 is warranted where "there is a clear showing of bad faith on the part of an attorney." <u>Shafii v. British Airways, PLC,</u> 83 F.3d 566, 571 (2d Cir.1996).  The District Court also has inherent power to award sanctions when it determines a party or attorney "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  <u>Sierra Club v. U.S. Army Corps. Of Engineers,</u> 776 F.2d 383, 390 (2d Cir. 1985).  "As with sanctions imposed pursuant to a court's inherent power, in the § 1927 context, bad faith may be inferred 'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" <u>Schlaifer Nance & Co. v. Estate of Warhol,</u> 194 F.3d 323, 336 (2d Cir. 1999) (quoting <u>Shafii,</u> 83 F.3d at 571).  A District Court may impose sanctions where it finds that "(1) the challenged claim was without colorable basis, and (2) the claim was brought in bad faith, i.e. motivated by improper purposes such as harassment or delay."  <u>Id.</u>

i.   <u>Colorability</u>

Defendant's Counterclaim purports to seek "repayment of funds" paid by mistake, and also asserts an unjust enrichment claim. (Answer and Counterclaim at 9-10.) The Counterclaim states that "From 2006 to 2008, CDI mistakenly paid commissions to Marathon in the amount of approximately $1,262,859.17 under the mistaken belief that it was obligated to do so under the ARCA," and that "In 2009, JAKKS mistakenly paid commissions to Marathon under the ARCA in the amount of approximately $215,806.42, under the mistaken belief that it was obligated to do so under the ARCA." (<u>Id.</u> at 8.) CDI counterclaims for a total of nearly $1.5 million. (<u>Id.</u> at 9.) Neither the exact nature of the alleged mistake, nor the identity of the party responsible for such mistake is stated clearly in the Counterclaim. The Counterclaim does not assert any detailed factual support with regard to this alleged mistake, nor do Defendant's papers in this motion. As discussed earlier, the Court has ruled that these payments were not in fact mistakenly made, because CDI expressly assumed CDI-PA's obligation to pay commissions to Marathon under the ARCA concurrent with its acquisition of CDI-PA. <u>See</u> Miller Decl., Ex. D at § 2.1(c)(ii).

In order to determine whether CDI's Counterclaim was colorable, the Court must decide whether the claim "has some legal or factual support, considered in light of the reasonable beliefs of the individual making the claim." <u>Nemeroff v. Abelson</u>, 620 F.2d 339, 348 (2d Cir. 1980). "The question is whether a reasonable attorney could have concluded that facts supporting the claim might be established, not whether such facts had been established." <u>Id.</u>

14

Of course had CDI paid Marathon commissions under the ARCA mistakenly, it would be entitled to repayment of funds. "In the area of restitution, New York has long recognized the rule that 'if A pays money to B upon the erroneous assumption of the former that he is indebted to the latter, an action may be maintained for its recovery.'" Banque Worms v. BankAmerica Intern., 77 N.Y.2d 362, 366, 570 N.E.2d 189 (1999) (quoting Ball v. Shepard, 202 N.Y. 247, 253, 95 N.E. 719 (1911)). However, the record demonstrates that there is no legal or factual support for CDI's allegation of mistake that would entitle Defendant to restitution for making payment of commissions to Marathon for over three years following the APA's Effective Date.

In support of its motion for sanctions, Plaintiff points to several emails written by attorneys employed Defendant's law firm that, Plaintiffs contend, demonstrate that firm's awareness that by affirmatively assuming the ARCA's obligations, CDI was binding itself and JAKKS to pay commissions on sales made under the license agreements. (Lawless Decl., Ex. 15.) Defendants contend that these emails "do not have the meaning which plaintiff mistakenly ascribes to them," and that the emails were drafted in conjunction with a proposed amendment to the ARCA that was never presented to Plaintiff or executed. (Def.'s Mem. in Opp. at 6-7, 18.) Thus, circumstances surrounding these emails remain uncertain, but the Court need not rely on the information contained within them in deciding this motion.

Setting that email evidence aside, it remains difficult to conceive how a reasonable attorney in the position of Defendant's counsel, Messrs. Miller and Honig, in drafting the counterclaim, "could have concluded that facts supporting the claim might be established." Nemeroff, 620 F.2d at 348. The law governing assignment of contractual

15

rights and duties is well established.  See Am. Jur. 2 Assignments § 127-128;

Restatement (Second) of Contracts at § 328.  In light of the clarity of the law on this

issue, Defendant's claim that by accepting assignment of the ARCA and assuming its

obligations, CDI only intended to bind itself to pay commissions on CDI-PA's sales is

spurious.  CDI's assumption of the ARCA's obligations is unambiguously stated in the

APA. Furthermore, following the acquisition, CDI paid commissions to Marathon

consistent with these obligations for a period of nearly three years, twice extending the

terms of the ARCA in order to retain Marathon's services.  (Pl.'s 56.1 Statement at ¶ 38;

Miller Decl., Ex. C.)  The possibility that such steps were taken mistakenly, in view of

the express language of the APA to the contrary, is extremely remote.  Thus, the

Counterclaim seeking repayment on the grounds of mistake is not colorable.

     ii.    <u>Bad Faith</u>

The second element of a claim for sanctions requires that the claim be brought in

bad faith. <u>Schlaifer</u>, 194 F.3d at 336.  "[B]ad faith may be inferred 'only if actions are so

completely without merit as to require the conclusion that they must have been

undertaken for some improper purpose such as delay.'"  <u>Id.</u>

The Counterclaim seeking repayment of commission payments is entirely

meritless.  As discussed at length earlier, CDI expressly undertook the obligation of

making such payments in the APA, in January 2006.  CDI then agreed to extend the

ARCA twice, in December 2006 and 2007, pursuant to amendments to the ARCA signed

by CDI's then President, Geoffrey Greenberg.  (Miller Decl., Ex. C.)  CDI continued to

pay commissions to Marathon (Decl. of Mark Dwyer at ¶ 5.)  Mr. Greenberg resigned as

President of CDI in December 2008, and CDI stopped paying commissions to Marathon

in the Spring of 2009.  (Pl.'s 56.1 Statement at ¶ 36, 39; Def.'s 56.1 Statement at ¶ 36, 39.)  The Counterclaim contradicts both the facts surrounding this particular transaction and the clear and long-standing law governing assignment and assumption.

A review of the facts and law in this case inescapably leads to the conclusion that Defendant's lawyers could not have filed their counterclaims in a good faith effort to win on the merits of the their Counterclaim.  The only apparent logical reason for Defendant, a subsidiary of a publicly traded company, to file a meritless claim for $1.5 million is for an *in terrorem* effect, i.e. to pressure Marathon, a smaller company, into settling for a lesser amount than they are entitled to receive under the ARCA.  Bringing a counterclaim that is so clearly without foundation is indicative of bad faith on the part of Defendant's counsel.

In view of the complete lack of legal and factual support underlying Defendant's Counterclaim, Defendant's attorneys Larry Miller, Jonathan Honig and the firm Feder Kaszovitz LLP are sanctioned pursuant to 28 U.S.C. § 1927.  Messrs. Miller and Honig and the firm of Feder Kaszovitz LLP shall be required to satisfy the excess costs, expenses, and attorneys' fees incurred by Plaintiff as a result of their filing of this Counterclaim.

B.  Rule 11

Plaintiff has also moved for sanctions against Defendant's law firm Feder Kaszovitz LLP under Fed. R. Civ. P. 11.  Rule 11(b) provides:

> **Representations to the Court.**  [B]y presenting to the court a pleading, written  motion or other paper…an attorney…certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1)      It is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of the litigation;
(2)      The claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
(3)      The factual contentions have evidentiary support, or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4)      The denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or lack of information.

Fed. R. Civ. P. 11(b).

Rule 11(c)(2), governing Motions for Sanctions incorporates a mandatory notice scheme, requiring that a party moving for sanctions under Rule 11 provide notice and a reasonable opportunity to respond. Fed. R. Civ. P. 11(c)(2). Under this provision, a motion for Rule 11 sanctions cannot be filed with the court if the objectionable paper, claim, defense or contention is not withdrawn or corrected within 21 days. Plaintiff filed its Rule 11 motion on September 21, 2010, separately from any other papers, as required under Rule 11(c)(2). Plaintiff informed Defendant's counsel by letter to Mr. Miller dated August 26, 2010 that their motion for sanctions under 28 U.S.C. § 1927 incorporated into their summary judgment motion filed on August 25, 2011, was to be construed as safe harbor service of their proposed Rule 11 notion. (Decl. of Mark Lawless at ¶ 4.) Defendant replied to Plaintiff's motion for sanctions under 28 U.S.C. § 1927 and acknowledged that it had been alerted to the possibility of a Rule 11 motion in its opposition brief filed on October 1, 2010. Thus, the Court finds Rule 11's notice provisions to be satisfied.

In considering a motion for sanctions under Rule 11, this Court applies an objective standard of reasonableness, "examining whether, under the circumstances of a

given case, the signer has made a 'reasonable inquiry' into the basis of a filing."

MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 73 F.3d 1253, 1257-58 (2d Cir.1996).

Moreover, "[R]ule 11 is violated only when it is patently clear that a claim has absolutely

no chance of success." Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir.1986) (internal

quotation marks and citation omitted). Additionally, "[w]hen divining the point at which

an argument turns from merely losing to losing and sanctionable, ... courts [must] resolve

all doubts in favor of the signer" of the pleading. Rodick v. City of Schenectady, 1 F .3d

1341, 1350 (2d Cir.1993) (internal quotation marks omitted).

   Plaintiff's brief in favor of Rule 11 sanctions devotes a substantial portion of its

argument to a disputed email (the "Bass Email"). As discussed earlier, there is a dispute

between the parties regarding the Bass email, among other emails, exchanged by

attorneys hired by the Defendant. Plaintiff asserts that these emails directly contradict the

Defendant's claim that it paid commissions to Marathon after the 2006 acquisition by

mistake, while Defendant claims that the emails are discussing an entirely distinct

proposed agreement that was never executed. There is a genuine issue of fact regarding

the context surrounding the exchange of these emails, and therefore in the judgment of

the Court it is inappropriate to award sanctions pursuant to Rule 11 on this basis.

   Plaintiff also bases its motion for Rule 11 sanctions, however, on Defendant's

pleading of mistake in its Counterclaim. (Decl. of Mark Lawless in Supp. of Pl.'s Mot.

for Sanctions Under R. 11 at ¶ 5.) As discussed earlier, Defendant's Counterclaim for

repayment of funds due to mistake is completely meritless. It is evident that Defendant's

counsel did not engage in a reasonable inquiry into the basis for this filing, because had

Mr. Miller or Mr. Honig read the entire APA and the ARCA, and then engaged in a few

minutes of elementary legal research to discern the meaning of the terms "assign" and "assume," (if they were not already familiar with such terminology) they would have been on notice that their contention was untenable.  To fail to perform either of those steps is objectively unreasonable, and is sanctionable under Rule 11(b)(2).  See Roeder v. Rogers, 58 Fed. Appx. 879, 880 (2d Cir. 2004) (summary order) (affirming award of sanctions where complaint lacked legal foundation).

Defendant's counsel's decision to bring this counterclaim was more than imprudent.  Demanding nearly $1.5 million, without any legal or factual support, while driving up Plaintiff's legal fees, constitutes a waste of judicial resources for an illegitimate purpose. Thus, in addition to the sanctions entered against Mr. Miller, Mr. Honig and Feder Kaszovitz LLP under 28 U.S.C. § 1927, this Court also finds that Defendant's attorneys and firm shall be liable for Plaintiff's attorneys' fees and costs incurred in responding to this Counterclaim under Rule 11.

## CONCLUSION

Plaintiff has established that there is no genuine issue of material fact with regard to Defendant's continuing obligation to pay Plaintiff commissions as set forth in the ARCA, and Plaintiff is entitled to summary judgment on its claim of breach of contract as a matter of law.  Defendant's counterclaims for restitution and declaratory judgment are dismissed in their entirety.  Accordingly, Plaintiff is awarded a judgment declaring that it is not liable to CDI for disgorgement or restitution of any payments made under the ARCA.  Plaintiff's motions for sanctions under 28 U.S.C. § 1927 and Fed. R. Civ. P. 11 against Defendant's attorneys and their firm, Feder Kaszovitz LLP, are granted.

Plaintiff is directed to submit a Form of Judgment, within 10 days, and with 3-day notice to Defendant, regarding the amount of damages to be paid for unpaid commissions and for future commissions due and payable under the ARCA. Plaintiff's motion for attorneys' fees, awarded hereby as sanctions under 28 U.S.C. § 1927 and Rule 11, shall be filed within 30 days.

IT IS SO ORDERED.

Dated:  New York, New York
        March 16, 2011

_Robert P. Patterson, Jr._

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were faxed to:

Mark Joseph Lawless
Mark J. Lawless, Esq.
250 West 57th Street
Suite 1316
New York, NY 10107
(212)-754-0665
Fax: (212)-810-2427

Larry Benjamin Miller
Jonathan D. Honig
Feder, Kaszovitz LLP
845 Third Avenue
New York, NY 10022
(212)-888-8200
Fax: (212)-752-4632